### WILLIAMS v. HALFORD.

1. WIFE—CHILDREN—ILLEGITIMATE CHILDREN—ISSUES—BURDEN OF PROOF—TITLE.—In action by legitimate wife and child for three-fourths interest in lands alleged to have been conveyed by husband to mistress and by her to his illegitimate children, in violation of statute, the defendants setting up paramount title, the burden is on plaintiff to show that title of defendants is not paramount to their right to assert their equity, since illegitimate child may purchase land of his putative father; and if question of title on pleadings be submitted to the jury, trial Judge is bound by the verdict; but in such cases jury may be directed to find a special verdict.

2. TESTIMONY DE BENE ESSE.—NOTICE served on the 10th to take testimony *de bene esse* on the 20th is not sufficient.

Before JAS. F. IZLAR, special J., December, 1902. Reversed.

Action by Julia Williams and J. H. Williams against J. R. Halford *et al.* From Circuit decree, defendants appeal.

*Messrs. Howell & Gruber,* for appellants, cite: *Notice to take evidence de bene esse was not sufficient:* 43 S. C., 173;

Code, 88, sub. 16. *The only question being that of title, evidence on other issues before jury was improper:* 3 Rich. Eq., 80; 2 Strob. Eq., 184. *Father is not entitled to earnings of illegitimate children:* 2 Hill Ch., 624. *As to testifying from memoranda:* 14 S. C., 450.

*Messrs. Griffin & Padgett,* contra, cite: *As to notice of taking testimony de bene esse:* 64 S. C., 396; Code, 407. *Judge may submit issues out of chancery:* 43 S. C., 264. *As to directing verdict for defendants:* 64 S. C., 396; 29 S. C., 53; 22 S. C., 332; 47 S. C., 307, 446; 54 S. C., 115; 29 S. C., 49. *As to refreshing witness' memory:* 1 Rich., 234; 46 S. C., 104; 15 S. C., 376. *Court may adopt evidence offered before jury to base decree in equity on:* 30 S. C., 534; 17 S. C., 421; 49 S. C., 345; 14 S. C., 373. *Plaintiffs are entitled to rents and profits:* 2 Strob. Eq., 174; 3 Rich. Eq., 83.

August 4, 1903. The opinion of the Court was delivered by

MR. JUSTICE GARY. This action was brought under section 2368 of the Code of Laws, which is as follows: "If any person who is an inhabitant of this State, or who has any estate herein, shall have already begotten, or shall hereafter beget, any bastard child, or shall live in adultery with a woman, the said person having a wife or lawful children of his own living, and shall give, or settle, or convey, either in trust or by direct conveyance, by deed of conveyance, by deed of gift, legacy, devise, or by any other ways or means whatsoever, for the use and benefit of the said woman with whom he lives in adultery, or of his bastard child or children, any larger or greater proportion of the real clear value of his estate, real or personal, after payment of his debts, than one-fourth part thereof, such deed of gift, conveyance, legacy or devise, made or hereafter to be made, shall be null and void, in favor of wife and legitimate children, for so much of the amount or value thereof as shall or may exceed

such fourth part of his real and personal estate." The complaint alleges that the plaintiffs are the widow and son of James J. Williams, *alias* Halford, and that the defendants, J. R. Halford, Harriet Turner and Laura Abbot, are the illegitimate children of the said James J. Williams, *alias* Halford, begotten of Jane Crosby, after his marriage with Julia Williams. That Jane Crosby, *alias* Halford, died in 1894 and James J. Williams in 1896. That in 1871, James J. ·Williams conveyed certain real and personal property described in the fourth paragraph of the complaint to Jane Crosby in trust for his children by the said Jane Crosby; and that the said personal property with its increase was in the possession of Jane Crosby at the time of her death, but belonged to James J. Williams. That in 188  James J. Williams caused the said Jane Crosby to sell certain lands therein mentioned to S. M. J. Carter; that the funds arising from such sale were supplemented by the personal funds of James J. Williams and were reinvested in the purchase of certain lands therein described. That in 1892, James J. Williams, without consideration, conveyed to Jane Crosby all his real and personal estate of whatever kind soever. That in 1881, Jane Crosby conveyed certain of the property hereinbefore mentioned to her children by James J. Williams. That since the decease of James J. Williams the children born of Jane Crosby as aforesaid, for and in consideration of $100, conveyed to the defendant, J. W. Halford, certain of the property described in the complaint.

The 10th, 11th, 12th and 13th paragraphs of the complaint are as follows:

"10. That all property, both real and personal, in possession of the said Jane Crosby, *alias* Jane Halford, at her decease, of whatsoever kind or description, was conveyed to her by the said James J. Williams, *alias* James J. Halford, and Miner Carter, was, and is, in fact, the personal earnings and property of him, the said James J. Williams, *alias* James J. Halford, and was conveyed to her, the said Jane Crosby, *alias* Jane Halford, while they were living together in adul-

tery, and she to her children, all of which was illegal, null and void, which said deeds and conveyances were made for the express purpose of evading section 1887 of the Revised Statutes of South Carolina.

"11. That the said James R. Halford, B. F. Halford, J. W. Halford, Harriet Turner and Laura Abbott have been receiving the rents and profits of said estate property, and have disposed of and wasted the personal property of said estate of the value of $800, more than one-fourth of the value of said estate.

"12. That the plaintiff, Julia Williams, is entitled to one undivided third part of three-fourths of said estate and J. H. Williams to two-thirds of three-fourths thereof.

"13. That J. E. Halford, B. F. Halford, J. W. Halford, Laura Abbott and Harriet Turner were entitled to one-fifth each of one-fourth of the entire estate."

The defendants, J. R. Halford, B. F. Halford and Laura Abbott, answered the complaint as follows:

"First, for a first defense: 1. That they deny each and every allegation in the said complaint contained, and allege that they and their codefendants, Harriet Turner and J. W. Halford, are the exclusive owners of all the lands mentioned and described in the complaint.

"Second, for a second defense: 1. That neither the plaintiffs nor their ancestors, nor predecessors nor grantors, were seized or possessed of the premises described in the complaint within ten years last past before the commencement of this action.

"2. That these defendants' ancestress, Jane Halford, under whom they claim, entered into possession of the premises described in the complaint under claim of title, exclusive of any other right, founding such claim upon a written instrument as being a conveyance of the premises in question, and there has been a continued occupation and possession by the said Jane Halford of the premises included in this instrument under such claim for more than ten years past

before the commencement of this action and before the death of the said Jane Halford."

The third paragraph alleges the erection of certain improvements therein described.

His Honor, the presiding Judge, submitted the following issues to the jury to which the answers are attached, to wit:

"1. Are the defendants the exclusive owners of all the lands mentioned in the complaint? Answer: Yes.

"2. Did James J. Williams intermarry with one Julia Albrition, in the State of Florida, in 1852? Answer: Yes.

"3. Is J. H. Williams, the plaintiff herein, the legal son of said marriage? Answer: Yes.

"4. Are both the said Julia Williams, the wife, and J. H. Williams, the son, now alive? Answer: Yes.

"5. Did the said James J. Williams afterwards leave the State of Florida, come to the State of South Carolina, change his name to J. J. Halford, and while his wife, Julia, was alive, contract a second marriage with one Jane Crosby, and cohabit with her until his death? Answer: Yes.

"6. Are the defendants the fruit of the marriage entered into between James J. Halford and Jane Crosby? Answer: Yes.

"7. Did the said James J. Halford during his lifetime make the conveyances of his property as mentioned and set forth in the complaint herein? Answer: Yes.

"8. Did the said Jane Halford, on the 6th January, 1881, in consideration of natural love and affection, convey the lot or parcel of land described in paragraph five (5) of the complaint to her children? Answer: Yes.

"9. Was the 200 acre tract mentioned in paragraph four of the complaint and conveyed with other property by James J. Halford to Jane Halford in trust for the children of the said James J. and Jane Halford, sold at the instance of James J. Halford, and the proceeds reinvested in the purchase of that certain lot of land in the town of Walterboro? Answer: No."

In commenting on these issues, his Honor, the presiding

Judge, instructed the jury as follows: "The question here of legal title is raised by the pleadings and must go to the jury, according to the rule established by our Courts. Yet, this does not prevent the Court from submitting other issues to the jury for determination along with the question of title. And while you may find for the defendants on the question of legal title, you may find such facts which would enable the Court, when the cause comes up for hearing on the equity side of the Court, to do justice among the parties, and in that Court resort to the process of partition, if necessary, to obtain the proper results. The issues which you must determine upon the pleadings, including legal title to the premises in question, are stated in the issues which I have submitted to you. The answer of the jury to these questions is necessary to determine the rights of the parties, and to secure to them, respectively, their rights on the equity side of the Court. Now, while under the strict principles of the law, so far as the legal title is concerned, you may, if you find the other facts, outside of the legal title, to be true, not be able to find the legal title in the plaintiffs, and be compelled to find for the defendants, or, in other words, while you may be compelled to say in answer to the issue of title raised, that it is in the defendants, still this finding would not be inconsistent with your other findings of fact. For under the law the legal title may be in the illegitimate child or children, yet the lawful wife or child or children might, by reason of a violation of the act, still have such an interest or right in the property over the one-fourth part thereof as would in equity be preserved and secured to them."

The Circuit Judge refused a motion for a new trial as to the finding of the jury upon the issue of title. The cause was then called on calendar No. 2. After considering the testimony, the Circuit Judge rendered his decree, which concludes as follows: "It is, therefore, ordered and adjudged, that it be and hereby is referred to the master of Colleton County to take testimony and report to this Court the value of the several tracts or parcels of land conveyed by J. J.

Williams, *alias* J. J. Halford, and by Miner Carter to Jane Crosby, *alias* Jane Halford, at the time the same came into her possession; also, the value of all the personal property transferred by said deeds, or any or either of them, and which passed into the possession of the said Jane Crosby, *alias* Jane Halford, thereunder for the benefit of herself and children, whether the said real and personal property was conveyed in trust or otherwise; also, the indebtedness of the said J. J. Williams, *alias* J. J. Halford, at the time of making, or causing to be made, any of the deeds of convey- ance in question; also, the rents and profits of the real estate so conveyed since the death of the said J. J. Williams, *alias* J. J. Halford, over and above all permanent improvements enhancing the value thereof and all taxes paid thereon by the defendant.    And that said master do further report, under the principles herein announced, whether the amount of said real and personal property exceeded one-fourth of the clear value of the property, real and personal, at the time of the conveyances, or any or either of them, were made by the said J. J. Williams, *alias* J. J. Halford, and the amount of the excess over and above the one-fourth thereof.    And it is further ordered and adjudged, that the defendants have ten days from the hearing of said report or any exceptions thereto and order therein, to elect whether or not they will pay the sum, if any, ordered by the Court in excess of one-fourth to be paid to the plaintiffs, and retain the property; and if the defendants shall fail or refuse to elect within the time aforesaid, the plaintiffs have leave to apply to this Court for a writ or writs of partition, to enforce their rights under this decree, in order that a proper and necessary result in the said cause may be obtained; but in case the said report and order therein shall be that the value of the property in ques- tion does not exceed one-fourth in value of the clear value of the said property, after deducting the amount of the indebt- edness of the said J. J. Williams, *alias* J. J. Halford, after the payment of all his just debts at the time of the convey- ances as aforesaid, then that the title of the defendants

stands confirmed, and the complaint be dismissed. It is further ordered and adjudged, that the parties have leave to apply for further orders in the cause, either in open Court or at chambers, upon due notice upon the coming in of the master's report, and that all questions as to the costs of said action be reserved until the order of the Court is made on said report."

The appellant's exceptions are numerous, but under the view which this Court takes of the case, many of them present merely abstract questions and, therefore, need not be considered.

We will first consider the question whether the presiding Judge submitted the question of title to the jury in proper form under the pleadings in this case or gave due effect to the finding of the jury. In order that the plaintiffs may be able to get relief by the assertion of their equitable rights under the statute hereinbefore mentioned, it is incumbent on them to establish the fact that the defendants derive their title from the father of the alleged bastards. But a bastard is allowed to purchase property even from his putative father, if it is founded upon valuable consideration. *King* v. *Johnson,* 2 Hill Ch., 624. In the case just mentioned, the Court uses this language: "The obligations between parents and children are reciprocal. On the parent devolves the duty of maintaining, educating and providing for the child; in return for which the child owes obedience and assistance during minority and reverence and respect always; and it follows necessarily that if in law either is absolved from those obligations, so, also, is the other. Now, it is very clear that the putative father is not entitled in law to the custody of his natural child, in opposition to the claims of the mother, nor is he bound to provide for it, further than is required by express enactments of the legislature. 2 Kent's Com., 178, 1st ed. The child cannot inherit from the father, and the extent to which the father can provide for his illegitimate child is limited by the act above referred to. The father is not, therefore, entitled in

law to the services of his natural child. It is said, however, that when the other assumes and discharges the duties of a parent, corresponding duties arise on the part of the natural child; and this is true so long as this relation exists. But these relations are merely conventional; and, being voluntary, may be dissolved at pleasure. Not so as to the relations between the father and his legitimate children. The obligations between them are imposed by law, and neither can be dissolved from them. The right of the putative father to the custody and services of his natural child, must, therefore, arise out of contract, in which the parties· are at liberty to stipulate for themselves. There is certainly nothing in these relations to prevent the father from rewarding the child for its labor or being its agent to invest the proceeds; on the contrary, in despite of the stern policy which alienates the bastard from his putative father, nature has bound them together by ties which cannot be severed; and it is impossible to resist the feeling that there is a moral duty imposed on the father, to aid the child when he can do so without violating the law, or doing wrong to others. I am well aware that there is much danger of abuse in the application of this principle, and that without great circumspection it will be made a cover for evading the act, but of its correctness there can be no question; and abuses may be guarded against by requiring clear and unequivocal evidence of the fairness and reasonableness of the transaction. Of this, the present case may serve as an example; for it is apparent the defendant's testator was a mere drone in the hive, and that the land conveyed to the defendants is a very inadequate compensation for the long and faithful services of the defendants, out of the proceeds of which it was paid for."

The appellants denied the allegations of the complaint that their title was derived from James J. Williams as a gift, and likewise set up an independent title by adverse possession. This was sufficient to raise the question of *paramount* title in the trial of which by the jury the plaintiffs are required to

be the actors. *Bank* v. *Peterkin*, 52 S. C., 236. The presiding Judge does not seem to have considered the issue of title as arising out of chancery, and that its submission to the jury was for the enlightenment of the conscience of the Court; but it is evident he did regard the title upon which the appellants relied, as sufficient to defeat the equitable rights of the plaintiffs under the statute in case it was established to the satisfaction of the jury. The question of title was not a legal issue arising out of chancery, the submission of which to the jury was for the enlightenment of the Court's conscience. If the presiding Judge, when he submitted to the jury the issue : "Are the defendants the exclusive owners of all the lands mentioned and described in the complaint?" meant "exclusive owners" as against the equity of the plaintiffs, then he should have regarded the verdict as sufficient to defeat the plaintiffs' equity; while, on the other hand, if he did not intend that the jury should find a verdict that would defeat the equitable rights of the plaintiffs, he misconceived the scope of the issue of title raised by the pleadings. Upon the trial of the legal issue of title by the jury it is incumbent upon the plaintiffs to introduce testimony tending to prove all the material requirements of the statute alleged in the complaint, in order to show that the title of the appellants is not paramount to their right to assert their equity under the statutes. The defendants may defeat the case as made by the plaintiffs' testimony either by the introduction of testimony directly contradicting it, or may show that valuable consideration was paid for the property, or that they have an independent title arising from any other facts. We desire, however, it should be distinctly understood, that we do not undertake at this time to decide whether the defense of adverse possession is available or applicable in this case, as such question is not properly before us for consideration, and is, therefore, left open. This is a case in which the Circuit Court might find it advisable to direct the jury to find a special verdict as to the manner in which the appellants had title to the land under section 283 of the Code.

20—67

Having reached the conclusion that there should be a new trial upon the question of title, and that the pleadings raise a question of title in the appellants paramount to the claim of the plaintiffs, and which would, therefore, defeat it if sustained by the testimony, we do not deem in proper to decide any other question except that as to the time of serving notice to take testimony *de bene esse.* Notice to take the testimony of Julia Williams *de bene. esse* was served on the defendants' attorneys on the 10th day of November, 1902, and the testimony was taken on the 20th day of November, 1902. Section 2881 of the Code of Laws requires that "reasonable notice, not less than ten days, must first be given in writing by the party or his attorney proposing to take such deposition to the opposite party or his attorney of record." It will be observed that the notice required shall be not less than ten days. This case comes within the principle announced in *Adkins* v. *Moore,* 43 S. C., 173, 20 S. E., 985, in which the Court says: "The defendants were entitled to full twenty days from the time of service of the complaint till the day therein fixed for trial, and as they were required to appear on the twentieth day from the service thereof, the time was shorter than that required by law." It is true, section 407 of the Code provides that "the time within which an act is to be done, as herein provided, shall be computed by excluding the first day and including the last," but this was not a case in which the defendants were required to act "within" ten days. When such is the requirement, the party is in time, if he acts on the *tenth* day, for that is "within" ten days. If, however, the party is entitled to a notice of "not less than ten days," he is not required to act until the expiration of ten days, or, in other words, *after* ten days. The notice in this case was not sufficient, unless "within" and "not less than" or *after* mean the same thing, which cannot be successfully contended.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for a new trial upon the issue of title and for

such further proceedings as may be necessary under the pleadings.